IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

JUAN RESTREPO-DUQUE,                  :
                                      :
                Petitioner,           :
                                      :
        v.                            :        Civil Action No. 17-1745-CFC
                                      :
ROBERT MAY, Warden, and               :
ATTORNEY GENERAL OF THE               :
STATE OF DELAWARE,                    :
                                      :
                Respondents.[1]       :

_____

Juan Restrepo Duque. *Pro se* Petitioner.

Sean P. Lugg, Deputy Attorney General of the Delaware Department of Justice,
Wilmington, Delaware.  Attorney for Respondents.

_____

### **MEMORANDUM OPINION**[2]

September 29, 2022
Wilmington, Delaware

_____

[1]Warden Robert May replaced former Warden Dana Metzger, an original party to this
case.  *See* Fed. R. Civ. P. 25(d).

[2]This case was originally assigned to the Honorable Gregory M. Sleet and was re-
assigned to the undersigned judge on September 20, 2018.

CONNOLLY, CHIEF JUDGE:

Pending before the Court is Petitioner Juan Restrepo-Duque's Petition and Amended Petition for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 (hereinafter collectively referred to as "Petition"). (D.I. 2; D.I. 19) The State filed an Answer in opposition, to which Petitioner filed a Reply. (D.I. 26; D.I. 33) For the reasons discussed, the Court will deny the Petition.

I.    BACKGROUND

A. Factual History

> [Petitioner], using the profile "purecolombianblood," met Wolf on the internet. On January 29, 2010, Wolf picked up [Petitioner] at a Newark grocery store, and together they drove to Wolf's home in Smyrna, Delaware. There they drank beer and watched television. On February 14, 2010, Wolf sent [Petitioner] an email asking to meet again in person. Wolf picked up [Petitioner] from the Newark library at around 3:00 p.m., and the two bought beer before driving to Wolf's house. According to [Petitioner], they went upstairs to Wolf's bedroom to watch television and drink beer. Eventually, as Wolf attempted to touch [Petitioner] sexually, [Petitioner] claimed that he noticed a nine-inch knife on the nightstand. [Petitioner] testified that Wolf reached for the knife when he rebuffed Wolf's advances, but [Petitioner] grabbed the knife first. [Petitioner] sliced Wolf across the throat. Wolf then chased [Petitioner] out of the room, yelling at him to get out.

> Fearful that Wolf would call the police, [Petitioner] testified that he returned to the upstairs bedroom and found the door locked. He kicked the door open, shot Wolf with a BB gun, and stabbed him repeatedly. Once he was sure Wolf was dead, [Petitioner] pulled the bedding, the mattress, and the dresser on top of Wolf. He opened the windows and turned off the heat, despite it being a cold February day. [Petitioner] then retrieved the beer from the kitchen and packed a box with some of Wolf's belongings, including CDs, cellphones, a beeper, Wolf's laptop, and three sets of keys. [Petitioner] then left in Wolf's distinctive green 1994 Volkswagen Jetta. He

stopped at a Kmart to buy new clothing and to dispose of his bloody clothes and shoes.

On February 15, 2010, [Petitioner] drove Wolf's car to the Newark Farmers Market.   He used Wolf's credit card to purchase two tasers and three knives.  He then threw the knife that he used to stab Wolf and the BB gun in a creek near his home.   He left Wolf's laptop buried in the snow in Deacons Walk Park.   Finally, he abandoned Wolf's Jetta in Brook Haven Park.

On February 19, 2010, after Wolf failed to show up to work, two of his coworkers went to his home to check on him.  They noticed the windows were open and saw his wallet and other personal belongings scattered on the front lawn. They called the police, who discovered Wolf's body upstairs.

The police sent a desktop computer recovered from Wolf's home to the State Police High Tech Crimes Unit for analysis. Later that same day, a tree surgeon in Deacons Walk Park discovered Wolf's laptop under the snow.   The police analyzed both of Wolf's computers and discovered that Wolf had communicated with someone using the screen name "purecolombianblood" on January 29 and February 14.  An internet search of "purecolombianblood" led to pictures and online profiles that linked the screen name to [Petitioner].  The police also learned that Wolf's credit card had been used at the Newark Farmers Market on February 15.  A February 15 surveillance video of the Farmers Market parking lot showed Wolf's distinctive green Jetta pulling in and leaving, though the driver and the license plate number could not be identified.

The police secured a nighttime search warrant and went to [Petitioner's] house around midnight on February 22, 2010. The search warrant affidavit alleged that there was probable cause to suspect that [Petitioner] had stolen Wolf's car and used his credit card.   At [Petitioner's] house, the police discovered the keys to Wolf's missing Jetta in the pocket of a pair of [Petitioner's] pants. The police brought [Petitioner] in for questioning in the early hours of February 23.   After reading [Petitioner] his *Miranda* rights, Detective William Porter said, "Having these rights in mind, do you wish to talk to me about this case?   Tell me your side of the story." [Petitioner] answered, "I don't know. What would be better?  If

3

> I talk to a lawyer." The detective replied, "I mean it's up to you I mean, it's perfectly up to you I mean. It be nice to get your ahh side of the story out because if you don't get your side of the story out we got to go with ... you know what I'm saying?" [Petitioner] said he understood. The detective then said, "Okay. So you wish to tell me your side of the story?" [Petitioner] replied, "Yeah why not."

> [Petitioner] then described the events of February 14 and 15. He also told the detective where Wolf's Jetta was and where the police could find the knife he used to stab Wolf. The police subsequently located Wolf's car in Brook Haven Park, where [Petitioner] said it would be, and the knife in the creek near his house.

*Restrepo-Duque v. State*, 130 A.3d 340 (Table), 2015 WL 9268145, at *1-2 (Del. Dec. 17, 2015).

## B. Procedural History

On June 7, 2010, a Kent County Grand Jury indicted Petitioner on charges of first degree murder, possession of a deadly weapon during the commission of a felony (PDWDCF), theft of a motor vehicle, second degree forgery, and carrying a concealed dangerous instrument. (D.I. 27-16 at 31-33) In November 2012, Petitioner filed a motion *in limine*, a motion to suppress, a motion for a *Franks* hearing,[3] and a motion to prohibit the death penalty. *See Restrepo-Duque*, 2015 WL 9268145, at *2. The Superior Court denied the motions, and the State withdrew its intent to seek the death penalty prior to trial. *See id.* at *2; (D.I. 27-1 at 15, Entry No. 125) On February 4, 2014, a Delaware Superior Court jury convicted Petitioner of all charges except second

---

[3]In *Franks v. Delaware*, the Supreme Court held that there are some circumstances where a defendant is entitled to an evidentiary hearing to challenge the truthfulness of facts alleged in support of a search-warrant application." *Franks v. Delaware*, 438 U.S. 154, 164-64 (1979).

4

degree forgery. *See Restrepo-Duque*, 2015 WL 9268145, at *2; (D.I. 27-1 at 18, Entry

No. 148)

> On April 15, 2014, the Superior Court held an office
> conference regarding the transcripts of [Petitioner's] police
> interview that were submitted to the jury during trial. The court
> found the submission of the transcripts to be conceivably
> prejudicial to [Petitioner] and granted a new trial on May 6,
> 2014. The second jury trial was held from November 17 to
> 26, 2014. Wolf's laptop and the social media posts linking
> "purecolombianblood" to    [Petitioner] were admitted into
> evidence. [Petitioner] was again convicted of second degree
> murder, possession of a deadly weapon during the
> commission of a felony, theft of a motor vehicle, and carrying
> a concealed dangerous instrument.

*Restrepo-Duque*, 2015 WL 9268145, at *3. In January 2015, the Superior Court

sentenced Petitioner to thirty years at Level V incarceration, followed by decreasing

levels of supervision. *See id.* The Delaware Supreme Court affirmed Petitioner's

convictions on December 17, 2015. *See id.* at *7. Petitioner filed a motion for rehearing

*en banc*, which the Delaware Supreme Court denied on January 12, 2016. (D.I. 26 at 2)

The United States Supreme Court denied Petitioner's petition for a writ of certiorari on

June 6, 2016, and denied his petition for rehearing on August 8, 2016. *See Restrepo-*

*Duque v. Delaware*, 136 S.Ct. 2413 (2016); *Restrepo-Duque v. Delaware*, 137 S.Ct. 16

(2016).

On January 6, 2017, while represented by counsel, Petitioner filed a motion for

postconviction relief pursuant to Delaware Superior Court Criminal Rule 61. (D.I. 27-1

at 24, Entry No. 209) Petitioner's original Rule 61 counsel was suspended from the

practice of law on January 26, 2017, and the Superior Court appointed the Office of

Conflicts Counsel to represent Petitioner in his Rule 61 proceeding. (D.I. 26 at 3)

Appointed Rule 61 counsel filed an amended Rule 61 motion in June 2018. (D.I. 27-1 at 28, Entry No. 239) In July 2018, Petitioner filed a motion to discharge appointed Rule 61 counsel along with a *pro se* Rule 61 motion. (D.I. 27-1 at 29, Entry No. 245) On August 1, 2018, after a colloquy, a Superior Court Commissioner granted Petitioner's motion to proceed *pro se* and dismissed appointed Rule 61 counsel from representation. (D.I. 27-1 at 30-31, Entry Nos. 253, 254) Petitioner filed an amended Rule 61 motion, and the State filed a response in opposition. (D.I. 26 at 3) On April 16, 2019, a Delaware Superior Court Commissioner issued a Report and Recommendation that Petitioner's Rule 61 motion should be denied as procedurally barred under Rule 61(i)(3) and as previously adjudicated under Rule 61(i)(4). *See State v. Restrepo-Duque*, 2019 WL 1772423, at *10 (Del. Super. Ct. Apr. 16, 2019). On June 20, 2019, the Superior Court adopted the Report and Recommendation and denied Petitioner's Rule 61 motion. *See id.* Petitioner did not appeal that decision.

### C. Procedural History in the District of Delaware

In July 2017, Petitioner filed in this Court a civil rights complaint under 42 U.S.C. § 1983. (*See* D.I. 1 in *Restrepo-Duque v. State*, Civ. A. NO. 17-1044-GMS) In December 2017, the Honorable Gregory M. Sleet issued an Order directing the Clerk to open a new habeas case, designating three documents from Petitioner's § 1983 case as constituting a petition under 28 U.S.C. § 2254 seeking federal habeas relief. (D.I. 1) In September 2018, Petitioner's case was re-assigned to this Court's docket. The Court issued an initial AEDPA Order informing Petitioner that papers he originally filed in his § 1983 action (*Restrepo v. Phelps*, Civ. A. No. 17-1744-CFC) had been liberally

6

construed to request federal habeas relief pursuant to 28 U.S.C. § 2254 resulting in the opening of a new habeas case. (D.I. 6) The liberally construed papers consisted of: (1) a document titled "Writ of Error" wherein Petitioner referred to the Uniform Commercial Code and stated that all of the charges against him must be dismissed and the charges withdrawn and nullified (D.I. 2 at 1); (2) a document alleging his actual innocence (D.I. 2-1 at 6); (3) an affidavit alleging that all of his constitutional rights had been violated and that the case must be dismissed (D.I. 2-2 at 12); and (4) a copy of a Rule 61 motion for post-conviction relief Petitioner had filed in the Delaware Superior Court (D.I. 2-2 at 5-12). The initial AEDEPA Order advised Petitioner that AEDPA applies to his proceeding, informed Petitioner about certain procedural consequences of AEDPA's application, and also contained a routine AEDPA Election Form for Petitioner to indicate how he wished to proceed. (D.I. 6) Given the uncertainty surrounding Petitioner's intent regarding the liberally construed documents, the Court also directed the Clerk of the Court to attach a form § 2254 petition so that he could clarify his claims if he still wished to seek habeas relief. (D.I. 6)

Petitioner did not file the AEDPA Election Form indicating how he wished to proceed or a completed form § 2254 petition clarifying his claims. The Court issued an Order to Show Cause which: (1) directed Petitioner to inform the Court in writing if he wished to proceed with the instant habeas proceeding; and (2) advised Petitioner that failing to inform the Court how he wished to proceed would result in the Court summarily dismissing the petition for failure to prosecute. (D.I. 11 at 3) Petitioner ultimately filed the amended Petition pending before the Court. (D.I. 19) The State filed an Answer in

7

Opposition (D.I. 26), to which Petitioner filed a Reply (D.I. 33). The Petition is ready for review.

## II.    GOVERNING LEGAL PRINCIPLES

### A. The Antiterrorism and Effective Death Penalty Act of 1996

Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) "to reduce delays in the execution of state and federal criminal sentences . . . and to further the principles of comity, finality, and federalism." *Woodford v. Garceau*, 538 U.S. 202, 206 (2003). Pursuant to AEDPA, a federal court may consider a habeas petition filed by a state prisoner only "on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Additionally, AEDPA imposes procedural requirements and standards for analyzing the merits of a habeas petition in order to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002).

### B. Exhaustion and Procedural Default

Absent exceptional circumstances, a federal court cannot grant habeas relief unless the petitioner has exhausted all means of available relief under state law. *See* 28 U.S.C. § 2254(b); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842-44 (1999); *Picard v. Connor*, 404 U.S. 270, 275 (1971). AEDPA states, in pertinent part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that —
>
> (A) the applicant has exhausted the remedies available in the courts of the State; or

8

> (B)(i) there is an absence of available State corrective process; or (ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

28 U.S.C. § 2254(b)(1). This exhaustion requirement, based on principles of comity, gives "state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan*, 526 U.S. at 844-45; *see Werts v. Vaughn*, 228 F.3d 178, 192 (3d Cir. 2000).

A petitioner satisfies the exhaustion requirement by demonstrating that the habeas claims were "fairly presented" to the state's highest court, either on direct appeal or in a post-conviction proceeding, in a procedural manner permitting the court to consider the claims on their merits. *See Bell v. Cone*, 543 U.S. 447, 451 n.3 (2005); *Castille v. Peoples,* 489 U.S. 346, 351 (1989). If the petitioner raised the issue on direct appeal in the correct procedural manner, the claim is exhausted and the petitioner does not need to raise the same issue again in a state post-conviction proceeding. *See Lambert v. Blackwell,* 134 F.3d 506, 513 (3d Cir. 1996).

If a petitioner presents unexhausted habeas claims to a federal court, and further state court review of those claims is barred due to state procedural rules, the federal court will excuse the failure to exhaust and treat the claims as exhausted. *See Coleman v. Thompson*, 501 U.S. 722, 732, 750-51 (1991) (such claims "meet[] the technical requirements for exhaustion" because state remedies are no longer available); *see also Woodford v. Ngo*, 548 U.S. 81, 92-93 (2006). Such claims, however, are procedurally defaulted. *See Coleman*, 501 U.S. at 749; *Lines v. Larkins*, 208 F.3d 153, 160 (3d Cir. 2000). Similarly, if a petitioner presents a habeas claim to the state's

9

highest court, but that court "clearly and expressly" refuses to review the merits of the claim due to an independent and adequate state procedural rule, the claim is exhausted but procedurally defaulted. *See Coleman*, 501 U.S. at 750*; Harris v. Reed*, 489 U.S. 255, 260-64 (1989).

Federal courts may not consider the merits of procedurally defaulted claims unless the petitioner demonstrates either cause for the procedural default and actual prejudice resulting therefrom, or that a fundamental miscarriage of justice will result if the court does not review the claims. *See McCandless v. Vaughn,* 172 F.3d 255, 260 (3d Cir. 1999); *Coleman,* 501 U.S. at 750-51. To demonstrate cause for a procedural default, a petitioner must show that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). To demonstrate actual prejudice, a petitioner must show that the errors during his trial created more than a possibility of prejudice; he must show that the errors worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Id.* at 494.

Alternatively, if a petitioner demonstrates that a "constitutional violation has probably resulted in the conviction of one who is actually innocent,"[4] then a federal court can excuse the procedural default and review the claim in order to prevent a fundamental miscarriage of justice. *See Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *Wenger v. Frank*, 266 F.3d 218, 224 (3d Cir. 2001). The miscarriage of justice exception applies only in extraordinary cases, and actual innocence means factual

---

[4]*Murray*, 477 U.S. at 496.

innocence, not legal insufficiency.  *See Bousley v. United States*, 523 U.S. 614, 623

(1998); *Murray*, 477 U.S. at 496.  A petitioner establishes actual innocence by asserting

"new reliable evidence—whether it be exculpatory scientific evidence, trustworthy

eyewitness accounts, or critical physical evidence—that was not presented at trial,"

showing that no reasonable juror would have voted to find the petitioner guilty beyond a

reasonable doubt.  *Hubbard v. Pinchak*, 378 F.3d 333, 339-40 (3d Cir. 2004).

### C. Standard of Review

　　　If a state's highest court adjudicated a federal habeas claim on the merits, the

federal court must review the claim under the deferential standard contained in 28

U.S.C. § 2254(d).  Pursuant to § 2254(d), federal habeas relief may only be granted if

the state court's decision was "contrary to, or involved an unreasonable application of,

clearly established federal law, as determined by the Supreme Court of the United

States," or the state court's decision was an unreasonable determination of the facts

based on the evidence adduced in the trial.  § 2254(d)(1) & (2); *see also Williams v.*

*Taylor*, 529 U.S. 362, 412 (2000); *Appel v. Horn*, 250 F.3d 203, 210 (3d Cir. 2001).  A

claim has been "adjudicated on the merits" for the purposes of § 2254(d) if the state

court decision finally resolves the claim on the basis of its substance, rather than on a

procedural or some other ground.  *See Thomas v. Horn*, 570 F.3d 105, 115 (3d Cir.

2009).  The deferential standard of § 2254(d) applies even "when a state court's order is

unaccompanied by an opinion explaining the reasons relief has been denied."

*Harrington v. Richter*, 562 U.S. 86, 98 (2011).  As explained by the Court in *Harrington*,

"it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Id.* at 99.

Finally, when reviewing a habeas claim, a federal court must presume that the state court's determinations of factual issues are correct. *See* § 2254(e)(1). This presumption of correctness applies to both explicit and implicit findings of fact, and is only rebutted by clear and convincing evidence to the contrary. *See* § 2254(e)(1); *Campbell v. Vaughn*, 209 F.3d 280, 286 (3d Cir. 2000); *Miller-El v. Cockrell*, 537 U.S. 322, 341 (2003) (stating that the clear and convincing standard in § 2254(e)(1) applies to factual issues, whereas the unreasonable application standard of § 2254(d)(2) applies to factual decisions).

## III.   DISCUSSION

The timely-filed Petition effectively asserts four Claims:[5] (1) the Superior Court violated Petitioner's Fourth Amendment rights by failing to suppress evidence

---

[5]The Petition purports to assert seven claims: (1) the search and arrest warrants lacked probable cause, and the Superior Court erred by not suppressing the evidence discovered as a result of the ensuing illegal search; (2) the Superior Court erred by not suppressing the statement Petitioner provided to the police, because: (a) the police violated his Fifth Amendment rights under *Miranda v. Arizona*, 384 U.S. 436 (1966) by ignoring his request for counsel, and (b) the police also failed to inform Petitioner of his rights under Article 36 of the Vienna Convention; (3) the Superior Court should have suppressed the portion of Petitioner's statement obtained after a police officer made a promise of confidentiality; (4) the evidence seized pursuant to the search warrant should have been suppressed as fruit of the poisonous tree, because the search warrant lacked probable cause; (5) the Superior Court violated Delaware evidentiary rules by admitting computer evidence and a social media post; (6) the Superior Court erred in admitting the knife into evidence because the length of the knife did not match the length of the wound; and (7) the State engaged in prosecutorial misconduct during closing and rebuttal argument. (D.I. 20 at 11-12)  The Court has consolidated the repetitive and related assertions, leaving the four Claims identified above.

12

discovered through the execution of invalid search and arrest warrants; (2) the Superior

Court erroneously admitted his incriminating police statement, because the statement

was procured in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966), Article 36 of the

Vienna Convention, and a promise of confidentiality; (3) the Superior Court erred by

admitting evidence found on Petitioner's laptop computer, Petitioner's social media post,

and the knife; and (4) the State engaged in several instances of prosecutorial

misconduct.

### A. Claim One: Fourth Amendment Violations

In Claim One, Petitioner contends that his Fourth Amendment rights were

violated by the admission of evidence seized pursuant to the execution of the search

and arrest warrants, because the warrants lacked probable cause. The State properly

argues that this Fourth Amendment Claim is not cognizable on federal habeas review

under the doctrine established in *Stone v. Powell*, 428 U.S. 465, 494 (1976). In *Stone*,

the Supreme Court held that a federal court cannot review a Fourth Amendment claim if

the petitioner had a full and fair opportunity to litigate the claim in the state court. *See*

*also Wright v. West*, 505 U.S. 277, 293 (1992). A petitioner is considered to have had a

full and fair opportunity to litigate such claims if the state has an available mechanism

for suppressing evidence seized in or tainted by an illegal search or seizure, irrespective

of whether the petitioner actually availed himself of that mechanism. *See U.S. ex rel.*

*Hickey v. Jeffes*, 571 F.2d 762, 766 (3d Cir. 1978); *Boyd v. Mintz*, 631 F.2d 247, 250

(3d Cir. 1980). Conversely, a petitioner has not had a full and fair opportunity to litigate

a Fourth Amendment claim, and therefore avoids the *Stone* bar, if the state system

contains a structural defect that prevented the state court from fully and fairly hearing the petitioner's Fourth Amendment argument. *See Marshall v. Hendricks*, 307 F.3d 36, 82 (3d Cir. 2002). Notably, "an erroneous or summary resolution by a state court of a Fourth Amendment claim does not overcome the [*Stone*] bar." *Id.*

In this case, Petitioner filed a pre-trial motion to suppress the evidence pursuant to Rule 41 of the Delaware Superior Court Rules of Criminal Procedure. The Superior Court denied the suppression motion after conducting a hearing. Petitioner then challenged that decision in his direct appeal to the Delaware Supreme Court. The Delaware Supreme Court affirmed the Superior Court's judgment, explaining that "there was sufficient information to support the finding of probable cause, and the omitted information would not have affected the overall mix of information to change the outcome." *Restrepo-Duque*, 2015 WL 9268145, at *4.

This record clearly demonstrates that Petitioner was afforded a full and fair opportunity to litigate his Fourth Amendment claims in the Delaware state courts. The fact that Petitioner disagrees with the Delaware state courts' decisions and their reasoning does not overcome the *Stone* bar. Therefore, the Fourth Amendment argument in Claim One is barred by *Stone*.

**B. Claim Two: Improper Admission of Petitioner's Police Statement**

Next, Petitioner contends that the Superior Court erred in admitting his incriminating police statement for three reasons: (a) the police proceeded to interrogate him after he requested counsel in violation of *Miranda*; (b) the police did not advise

14

Petitioner of his rights under Article 36 of the Vienna Convention; and (c) a police officer made and then violated "a promise of confidentiality to [Petitioner]" (D.I. 20 at 61).

### 1. *Miranda*

Petitioner presented Claim Two (a) to the Delaware Supreme Court on direct appeal, which denied the argument as meritless. Therefore, Petitioner will only be entitled to federal habeas relief for Claim Two (a) if the Delaware Supreme Court's decision was either contrary to, or an unreasonable application of, clearly established federal law.

The clearly established federal law governing a person's Fifth Amendment right to counsel during a custodial interrogation is the standard articulated in *Miranda v. Arizona* and its progeny. In *Miranda*, the Supreme Court held, *inter alia*, that statements made by a defendant during a custodial interrogation must be suppressed unless he was informed of and waived his right to counsel or his right to remain silent. *See id.* at 477-79; *see Colorado v. Connelly*, 479 U.S. 157, 168 (1986). A suspect wishing to invoke his *Miranda* right to counsel or his *Miranda* right to remain silent must do so unambiguously. *See Davis v. United States*, 512 U.S. 452, 461-62 (1994) ("But if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, our precedents do not require the cessation of questioning."); *see also Berghuis v. Thompkins*, 560 U.S. 370 (2010) (extending *Davis* requirement of unambiguous invocation to *Miranda* right to remain silent). A request for counsel is unambiguous when the defendant has articulated his

15

"desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Davis*, 512 U.S. at 459.  A request to remain silent is unambiguous when the defendant states that he wants to remain silent or that he does not want to talk with the police. *See Berghuis*, 560 U.S. at 381.  If the defendant "clearly invokes" his right to counsel, the police may not interrogate him unless counsel is made available or the defendant initiates the contact.  *See Edwards v. Arizona*, 451 U.S. 477, 485-87 (1981).

A defendant may waive his right to counsel but, in order for a waiver of *Miranda* rights to be valid: (1) "the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception"; and (2) "the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421 (1986).  A police statement can be involuntary even if it is made after the defendant was advised of, and waived, his *Miranda* rights.  A court determines if a statement was voluntarily made by evaluating the "totality of the circumstances surrounding the interrogation" to ascertain if the defendant made an uncoerced choice and had the requisite level of comprehension. *See Fare v. Michael C.*, 442 U.S. 707, 725 (1979); *Miller v. Fenton*, 796 F.2d 598, 604 (3d Cir. 1986).  "[C]oercive police activity is a necessary predicate to the finding that a statement is not 'voluntary.'" *Connelly*, 479 U.S. at 167.  "[C]oercion can be mental as well as physical." *Blackburn v. Alabama*, 361 U.S. 199, 206 (1960).  When determining voluntariness under the totality of the circumstances standard, a court must consider a

16

number of factors in addition to "the crucial element of police coercion," such as "the length of the interrogation, its location, its continuity, the defendant's maturity, education, physical condition, and mental health" and the failure of police to advise the defendant of his *Miranda* rights. *Withrow v. Williams*, 507 U.S. 680, 693–94 (1993); *see also Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973) (discussing factors). If a defendant was advised of his *Miranda* rights and voluntarily waived them, it will be difficult to claim that his statement was nonetheless involuntary. *See Missouri v. Seibert*, 542 U.S. 600, 609 (2004) (noting that "maintaining that a statement is involuntary even though given after warnings and voluntary waiver of rights requires unusual stamina"); *see also Berkemer v. McCarty*, 468 U.S. 420, 433 n. 20 (1984) ("[C]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of Miranda are rare."). Notably, even if the government uses psychological tactics to obtain a statement from a suspect, a statement is still considered voluntary as long as the suspect's decision to confess is a "product of the suspect's own balancing of competing considerations." *Miller*, 796 F.2d at 604.

Significantly, on collateral review, the issue of the voluntariness of a petitioner's statement to police is a legal question that is not entitled to the presumption of correctness afforded to a state court's factual findings. *See Miller v. Fenton*, 474 U.S. 104, 112 (1985). A court must examine the record and make an independent determination as to whether the state court's legal determination of voluntariness was contrary to, or an unreasonable application of, Supreme Court precedent. *See id.* ("the

ultimate question whether, under totality of the circumstances, the challenged confession was obtained in a manner compatible with the requirements of the Constitution is a matter for independent federal determination."); *see also Lam v. Kelchner*, 304 F.3d 256, 264 (3d Cir. 2002) ("[U]nder the AEDPA habeas standard, [a court is] required to determine whether the state court's legal determination of voluntariness was contrary to or an unreasonable application of Supreme Court precedent."). In contrast, state-court findings related to "subsidiary questions, such as the length and circumstances of the interrogation, the defendant's prior experience with the legal process, and familiarity with the *Miranda* warnings," are entitled to the presumption of factual correctness under § 2254. *Miller*, 474 U.S. at 117 (identifying the pre-1996 version of § 2254(d) as the applicable statutory section); *see also Sweet v. Tennis*, 386 F. App'x 342, 345 (3d Cir. 2010) (identifying § 2254(e)(1) as the appropriate statutory section). If the state court's "account of the evidence is plausible in light of the record viewed in its entirety, the [reviewing court] may not reverse it." *Anderson v. Bessemer City*, 470 U.S. 564, 573-74 (1985) (describing clearly-erroneous review generally).

Here, the Delaware Supreme Court rejected Petitioner's argument that the police violated his Fifth Amendment rights under *Miranda* when procuring his statement, explaining:

> [Petitioner] next argues that the Superior Court erred by not suppressing his statement to police. The Superior Court found that [Petitioner] ambiguously invoked his right to counsel. This Court has held that "[w]here a suspect does not unequivocally invoke that right, the police should be entitled to attempt to determine the suspect's intention" and has

18

endorsed the "clarification approach" which may include "the repeating of *Miranda* warnings as a means of emphasizing the defendant's constitutional right to counsel." However:

> If . . . the police make additional inquiries concerning a suspect's intentions, the clarifying questions may not coerce or intimidate the suspect or otherwise discourage his effort to secure counsel, if that is his intention. Nor may the police tender any legal advice or attempt to dissuade the suspect from pursuing an intended course.

In this case, [Petitioner] responded to a request to make a statement by saying, "I don't know. What would be better? If I talk to a lawyer." Detective Porter responded, "I mean it's up to you I mean, it's perfectly up to you I mean. It be nice to get your ahh side of the story out because if you don't get your side of the story out we got to go with ... you know what I'm saying?" The Superior Court found that detective's statement was "probably not ideal," but nonetheless concluded that the statement did not exceed the bounds of clarification permitted by this Court in *Crawford [v. State,* 50 A.2d 571 (Del. 1990)]. According to the trial court, the detective's statement did not "coerce or intimidate" [Petitioner], and did not "discourage his effort to secure counsel" because the extraneous statements did not reach the level of coercion found in other cases. The Superior Court also relied heavily on the fact that, under the "totality of the circumstances," the interview did not appear coercive. According to the court, the questioning was conversational and [Petitioner] was not outwardly in distress—he expressly agreed to talk to the detective.

The State does not challenge the ambiguity of [Petitioner's] reply to the *Miranda* warning. Instead, the State argues that this Court's decision in *Crawford* should be overruled in favor of the federal "bright line rule" where police may continue questioning in the face of an ambiguous or equivocal request for counsel. In the alternative, the State argues that based on the totality of the circumstances, the police questioning did not exceed the bounds of clarification.

We decline the State's invitation to overrule *Crawford*. Applying *Crawford*, we agree with the Superior Court that the

19

police questioning was less than ideal. The detective's importuning of [Petitioner] to give his side of the story rather than invoke his right to counsel is troublesome. The detective's answer to [Petitioner's] question could also be viewed as advice, rather than clarification. But looking at the "totality of the circumstances," the detective's statement does not reach the level of coercion found in other cases. The questioning was not intimidating or coercive. Further, [Petitioner] responded by saying "Why not?" Based on our independent review of the interview, we agree with the Superior Court that [Petitioner's] statement was given voluntarily, knowingly, and intelligently, and the police did not exceed the bounds of permitted clarification. Thus, under the totality of the circumstances, we affirm the Superior Court's ruling on this issue.

*Restrepo-Duque*, 2015 WL 9268145, at *4-5 (citation omitted).

Turning to the inquiry under § 2254(d) in this case, although the Delaware Supreme Court did not explicitly cite clearly established federal law when considering the issues of ambiguity, voluntariness, and waiver with respect to Petitioner's police statement, the Delaware Supreme Court did apply "the totality of the circumstances" standard when reviewing the merits of Claim Two (a). Therefore, the Delaware Supreme Court's decision is not contrary to clearly established federal law. *See Fahy v. Horn*, 516 F.3d 169, 196 (3d Cir.2008) (finding that the Supreme Court of Pennsylvania's decision was not "contrary to" clearly established federal law because that decision "complie[d] with the Supreme Court's mandate to consider the totality of the circumstances.").

The Court must also determine whether the Delaware Supreme Court's denial of the instant argument was based on a reasonable application of clearly established federal law. The transcript of Petitioner's videotaped police interview reveals that

Detective Porter advised Petitioner of his *Miranda* rights at the outset of the interview and, when asked if he understood those rights, Petitioner responded affirmatively. (D.I. 27-17 at 29) Petitioner, however, contends that he invoked his right to counsel soon thereafter during the following exchange:

> Detective Porter: Okay. Having these rights in mind, do you wish to talk to me about this case? Tell me your side of the story?
>
> Petitioner: I don't know. What would be better? If I talk to a lawyer.
>
> Detective Porter: I mean it's up to you I mean, it's perfectly up to you. It [would] be nice to get your ahh side of the story out because if you don't get your side of the story out we got to go with . . . you know what I'm saying.
>
> Petitioner: Yeah, I understand.
>
> Detective Porter: Okay. So you wish to tell me your side of the story?
>
> Petitioner: Yeah why not.

(D.I. 27-17 at 29) According to Petitioner, the phrase "If I talk to a lawyer" clearly and unambiguously invoked his right to counsel, "because 'IF' is a conditional word that is only and exclusively used to demand firm conditions." (D.I. 33 at 10) (emphasis in original)

Having reviewed the record, the Court concludes that the Delaware Supreme Court reasonably determined the facts and applied the totality of the circumstances standard in finding that, although Petitioner ambiguously invoked his right to counsel under *Miranda*, Petitioner's subsequent waiver of his *Miranda* rights was voluntary,

knowingly made, and the result of his deliberate choice to continue with the interview.
After saying "if I talk to a lawyer," Petitioner (1) explicitly stated that he understood that it
was up to him to decide whether to proceed with the interrogation; (2) said "yeah why
not" when asked if he wanted to tell his side of the story; and (3) continued to answer
Detective Porter's questions.  (D.I. 27-17 at 29-100)  Viewed in its totality, this conduct
demonstrates a waiver of any intention to seek counsel.  Thus, the Court will deny
Claim Two (a) for failing to satisfy § 2254(d).

### 2. <u>Vienna Convention</u>

In Claim Two (b), Petitioner argues that his police statement should have been
suppressed because the police violated his rights under Article 36 of the Vienna
Convention on Consular Relations by failing to inform him that he had the right to confer
with the Colombian consulate upon his detention.  (D.I. 33 at 10)  The Delaware
Supreme Court denied this argument as meritless during Petitioner's direct appeal.
Therefore, Claim Two (b) will only warrant relief if the Delaware Supreme Court's
decision was either contrary to, or an unreasonable application of, clearly established
federal law.

In *Sanchez-Llamas v. Oregon*, after refraining to address whether Article 36
grants rights that may be invoked by individuals in judicial proceedings, the United
States Supreme Court held that the failure to inform a suspect of his consular rights
under Article 36 of the Vienna Convention on Consular Relations does not warrant
suppression of statements to investigators.  *See Sanchez-Llamas v. Oregon*, 548 U.S.
331, 350 (2006).  The Third Circuit has also held that, assuming that the Vienna

Convention grants individually enforceable rights, "[d]ismissal of [an] indictment and suppression of evidence are not appropriate remedial measures for a violation of Article 36." *United States v. Castillo*, 742 F. App'x 610, 614-15 (3d Cir. 2018).

In this case, the Delaware Supreme Court denied Petitioner's instant argument on direct appeal after applying *Sanchez-Llamas*, explaining:

> Article 36 secures only a right of foreign nationals to have their consulate informed of their arrest or detention—not to have their consulate intervene, or to have law enforcement authorities cease their investigation. In this case, suppression of [Petitioner's] statement would be a vastly disproportionate remedy for an Article 36 violation. Therefore, the Superior Court did not abuse its discretion in denying [Petitioner's] motion to suppress.

*Restrepo-Duque*, 2015 WL 9268145, at *5. The Delaware Supreme Court's refusal to suppress Petitioner's police statement as a remedy for an Article 36 violation was neither contrary to, nor an unreasonable application of, *Sanchez-Llamas*. Therefore, the Court will deny Claim Two (b) as meritless.

### 3. **Promise of confidentiality**

During the police interrogation of Petitioner, Detective Chorlton stated:

> I don't know if you're embarrassed about why you were there or about seeing him naked or having sex with him or any of that, just understand we don't . . . we don't care about that . . . that . . . that is nothing to be embarrassed about in front of us, okay. We're not your friends, we're not someone . . . we're not gonna go back and tell anyone, we're having a conversation with you okay. So we need you to be 100% honest not just a little.

(D.I. 27-17 at 46) According to Petitioner, Detective Chorlton's "promise of confidentiality" affirmatively misled and/or deceived Petitioner into believing that his

23

statement would remain confidential, thereby invalidating any prior waiver of *Miranda* rights.  (D.I. 33 at 13)

Petitioner did not exhaust state remedies for this specific instance of alleged police deception because he did not present it as an independent challenge to the admission of his police statement during his direct appeal or Rule 61 appeal.  Any attempt by Petitioner to assert the instant argument in a new Rule 61 motion would be barred as untimely under Delaware Superior Court Criminal Rule 61(i)(1) and as successive under Rule 61(i)(2).  *See Parker v. DeMatteis*, 2021 WL 3709733, at *6 (D. Del. Aug. 20, 2021).  Although Rule 61 provides for an exception to its procedural bars if a Rule 61 motion "asserts a retroactively applicable right that is newly recognized after the judgment of conviction is final," no such right is implicated in the instant Claim. Similarly, the exceptions to Rule 61 bars contained in Rule 61(i)(5) and (d)(2) do not apply to Petitioner's case, because he does not allege actual innocence, lack of jurisdiction, or that a new rule of constitutional law applies to Claim Two.  Given these circumstances, the Court must treat the argument as exhausted but procedurally defaulted, thereby precluding habeas review absent a show of cause-and-prejudice or that a miscarriage of justice will occur without a merits review.

Petitioner does not assert any cause for his failure to present his instant contention about the promise of confidentiality to the Delaware Supreme Court on direct or post-conviction appeal.  In the absence of cause, the Court need not address the issue of prejudice.  Additionally, the miscarriage of justice exception to the procedural default doctrine cannot be applied to excuse Petitioner's default, because he has failed

24

to provide any new reliable evidence of his actual innocence. In sum, Claim Two (c) is procedurally barred from habeas review.

Nonetheless, even if Claim Two (c) were not procedurally barred, the Claim would not entitle Petitioner to habeas relief. As previously explained, coercive police activity is a "necessary predicate" to holding a confession constitutionally involuntary. *See supra* at Section III.B.1. Importantly, however, there is a distinction between police trickery as a means of coercion and police trickery as mere strategic deception; "[p]loys to mislead a suspect or lull him into a false sense of security that do not rise to the level of compulsion or coercion to speak are not within *Miranda*'s concerns." *Illinois v. Perkins*, 496 U.S. 292, 297 (1990). A law enforcement agent may use some psychological tactics or even actively mislead a defendant in order to obtain a confession, provided that a rational decision remains possible. *See Frazier v. Cupp*, 394 U.S. 731, 739 (1969) (stating police misrepresentation that co-defendant had confessed did not render otherwise voluntary confession inadmissible). As a general rule, police can lie to a suspect about the extent of the evidence against the suspect or feign friendship with the suspect without fear of rendering the resulting confession involuntary. *See id.* at 731, 737–39. "Subtle pressures may be as telling as coarse and vulgar ones. The question is whether the accused was deprived of his free choice to admit, to deny, or to refuse to answer." *Garrity v. State of N.J.*, 385 U.S. 493, 496 (1967); *see also Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973) (stating test for determining voluntariness of confession is whether, in light of all surrounding circumstances, defendant's will was overborne).

Here, having already been advised of his *Miranda* rights, Petitioner was aware that any statements made would be used against him in a court of law. Although a knowing and voluntary *Miranda* waiver does not necessarily demonstrate that a subsequent statement was voluntary, it does show that Petitioner knew he had the right to remain silent, yet he still provided a statement. *See Oregon v. Elstad* , 470 U.S. 298, 318 (1985) (acknowledging that suspect's choice to speak after receiving *Miranda* warnings is highly probative of voluntariness). Nothing in the record indicates that Detective Chorlton's "promise of confidentiality" impaired Petitioner's "capacity for self-determination" or affected Petitioner's ability to make a rational decision regarding the courses of action available. *See Schneckloth*, 412 U.S. at 225; *Wyrick v. Fields*, 459 U.S. 42, 47 (1982). Additionally, when viewed in context, Detective Chorlton's "promise of confidentiality" was not a promise of non-prosecution but, rather, an attempt to put Petitioner at ease about his possible original intent for meeting with Wolf in the first place. *See Perkins*, 496 U.S. at 297 ("Ploys to mislead a suspect or lull him into a false sense of security that do not rise to the level of compulsion or coercion to speak are not within *Miranda*'s concerns."). Given these circumstances, the Court rejects Petitioner's contention that the Detective Chorlton's statement somehow invalidated Petitioner's *Miranda* waiver. Accordingly, the Court will deny Claim Two (c).

## C. Claim Three: Evidentiary Violations

In Claim Three, Petitioner contends that the Superior Court violated Delaware evidentiary rules by: (1) admitting the evidence found on the laptop computer without fully establishing the chain of custody for the computer; (2) admitting the social media

post without the proper foundation; and (3) admitting the knife, because the blade was shorter than the fatal wound that caused Wolf's death. (D.I. 20 at 12, 75, 78) Petitioner presented in his direct appeal his arguments concerning the laptop computer and social media post to the Delaware Supreme Court, which held that the State properly authenticated the laptop and the social media post in accordance with Rule 901 of the Delaware Rules of Evidence. *See Restrepo-Duque*, 2015 WL 9268145, at *6 and n.36 (citing *Parker v. State*, 85 A.3d 682, 687 (Del. 2014) which, in turn, held that "social media evidence should be subject to the same authentication requirements under the Delaware Rules of Evidence 901(b) as any other evidence."). Petitioner presented his argument concerning the length of the knife blade to the Superior Court in his Rule 61 proceeding, and the Superior Court provided the following explanation as to why Petitioner's argument lacked merit:

> The Medical Examiner testified that this happens when a decedent's body is compressed when he/she suffers a stab would. The knife was located on the bank of the creek where Restrepo-Duque said he threw the knife after he stabbed Wolf with it. The DNA analysis of the knife produced a partial DNA profile consistent with Wolf's DNA. The knife was capable of making that wound and a motion to suppress based on this assertion would have been baseless. This ground is meritless.

*Restrepo-Duque*, 2019 WL 1772423, at *8.

Claims alleging errors in state evidentiary rulings are only reviewable in habeas corpus proceedings if the evidentiary rulings rise to the level of a due process violation. *See Estelle v. McGuire*, 502 U.S. 62, 67-8 (1991). A petitioner establishes a due process violation by showing that the evidentiary error was so pervasive that he was denied a fundamentally fair trial. *See Biscaccia v. Attorney General of State of N.J*, 623

27

F.2d 307, 312 (3d Cir. 1980).  Claim Three asserts errors of state evidentiary law, and Petitioner has failed to demonstrate any related deprivation of a due process right. Therefore, the Court will deny Claim Three for failing to assert an issue cognizable on federal habeas review.

### D. Claim Four:  Prosecutorial Misconduct

In his final Claim, Petitioner asserts that the State engaged in prosecutorial misconduct during closing argument and rebuttal by mischaracterizing the evidence, providing personal opinions, and misstating facts not in evidence.  (D.I. 20 at 12-13, 81) Petitioner presents a series of instances he contends amount to prosecutorial misconduct, such as, *inter alia*, informing the jury that Petitioner initiated the social media chats when Petitioner was not the actual sender or receiver in the chats, and that Petitioner and Wolf showed each other photographs.

Petitioner did not raise any issues of prosecutorial misconduct to the Delaware Supreme Court on direct or post-conviction appeal.  As a result, he did not exhaust state remedies for Claim Four.

At this juncture, any attempt by Petitioner to raise Claim Four in a new Rule 61 motion would be barred as untimely under Delaware Superior Court Rule 61(i)(1) and as successive under Rule 61(i)(2).  *See* Del. Super. Ct. Crim. R. 61(i)(1) (establishing a one-year deadline for filing Rule 61 motions); Del. Super. Ct. Crim. R. 61(i)(2) (providing that second or successive motions shall be summarily dismissed unless they meet the pleading requirements of Rule 61(d)(2)(i) or (ii)).  Although Rule 61provides for an exception to its procedural bars if a Rule 61 motion "asserts a retroactively applicable

28

right that is newly recognized after the judgment of conviction is final," no such right is implicated in the instant Claim. Similarly, the exceptions to Rule 61 bars contained in Rule 61(i)(5) and (d)(2) do not apply to Petitioner's case, because he does not allege actual innocence, lack of jurisdiction, or that a new rule of constitutional law applies to Claim Two. Given these circumstances, the Court must treat Claim Four as exhausted but procedurally defaulted, thereby precluding habeas review absent a show of cause-and-prejudice or that a miscarriage of justice will occur without a merits review.

Petitioner attempts to establish cause by asserting that he presented Claim Four's prosecutorial misconduct argument as part of an ineffective assistance of counsel claim he included in his amended *pro se* Rule 61 motion filed in the Superior Court in December 2018, but the Superior Court ignored the argument. (D.I. 33 at 21) Even if Petitioner's assertion were correct, his default of Claim Four did not occur as a result of the Superior Court's failure to address his argument. Rather, the default of Claim Four occurred because Petitioner did not appeal the Superior Court's decision. Since Petitioner does not provide any reason for his failure to file a post-conviction appeal, the Court concludes that he has failed to establish cause for his default.

The absence of cause eliminates the need to address prejudice. In addition, the miscarriage of justice exception to the procedural default doctrine is inapplicable to excuse Petitioner's default because Petitioner has not provided any new reliable evidence of his actual innocence. Accordingly, the Court will deny Claim Four as procedurally barred from federal habeas review.

## V.     PENDING MOTION

In June 2022, Petitioner filed a letter Motion asking the Court to grant his request for habeas relief.  (D.I. 36)  Given the Court's conclusion that none of the Claims in the Petition warrant relief, the Court will dismiss the Motion as moot.

## VI.     CERTIFICATE OF APPEALABILITY

The Court must decide whether to issue a certificate of appealability.  *See* 3d Cir. L.A.R. 22.2 (2011).  A certificate of appealability may be issued only when a petitioner makes a "substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  This showing is satisfied when the petitioner demonstrates "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Additionally, if a federal court denies a habeas petition on procedural grounds without reaching the underlying constitutional claims, the court is not required to issue a certificate of appealability unless the petitioner demonstrates that jurists of reason would find debatable: (1) whether the petition states a valid claim of the denial of a constitutional right; and (2) whether the court was correct in its procedural ruling.  *See Slack,* 529 U.S. at 484.

The Court has concluded that the instant Petition fails to warrant federal habeas relief and is persuaded that reasonable jurists would not find this conclusion to be debatable.  Consequently, the Court will not issue a certificate of appealability.

## VII.    CONCLUSION

For the foregoing reasons, the Court will deny the instant Petition and Motion without an evidentiary hearing.

The Court will issue an Order consistent with this Memorandum Opinion.